## AMERICAN ARBITRATION ASSOCIATION

## COMMERCIAL ARBITRATION TRIBUNAL

In the Matter of the Arbitration between

Re: 16 489 Y 00437 08
    RP Johnson & Sons, Inc. and James C. Justice
Company, Inc.
           Claimants,
and

    Deere & Company and John Deere Company
          Respondents.

## AWARD OF ARBITRATORS

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance

with (1) Section XVII and Exhibit 4 of the John Deere Agricultural Dealer Agreement, dated

November 25, 2003, between Claimant R.P. Johnson & Sons, Inc. and Respondent Deere &

Company and (2) Section XVII and Exhibit 4 of the John Deere Agricultural Dealer Agreement,

dated June 8, 2004, between Blueridge Farm Center, Inc., a wholly-owned subsidiary of

Claimant  James C. Justice Company, Inc. and Respondent Deere & Company, and having been

duly sworn and having duly heard the proofs and allegations of the parties, do hereby AWARD

as follows:

### I.    <u>Background</u>

Claimants' Demand in this arbitration was filed on July 7, 2008.  The "Nature of the

Dispute" as set forth in the Demand states:

> Claimants, James C. Justice Company, Inc. and RPJohnson & Sons, Inc.
> both assert that Respondents John Deere Company and Deere and Company
> (collectively "John Deere") violated the Anti-Trust and Restraint of Trade laws
> of the United States involving a proposed sale of a John Deere dealership from
> RP Johnson & Sons, Inc. to James C. Justice Company, Inc.  In addition to Anti-

Trust violations, the Claimants also allege that the Respondents tortuously [sic] interfered with a contract with business relationships which James C. Justice Company, Inc. and RP Johnson & Sons, Inc had with each other and with business relationships which RP Johnson & Sons, Inc. had with other entities. RP Johnson & Sons, Inc. also asserts that the Respondents violated their contractual duty of good faith and fair dealing toward it.

The Demand states the amount of the claim to be $5,000,000 and also seeks "Attorney Fees, Interest and Other damages under applicable Anti-Trust Laws of the United States." Respondents (hereafter collectively "John Deere") filed an Answering Statement and Counterclaim on July 25, 2008. The Counterclaim is for $42,523.41, which John Deere alleged was owed to it by R.P. Johnson & Sons, Inc. ("RP Johnson") under the terms of RP Johnson's dealer agreement. See John Deere Agricultural Dealer Agreement, RP Johnson Sons, Incorporated Wytheville, Virginia, dated November 25, 2003 (the "RP Johnson Dealer Agreement"). (CX2)[1]

On July 23, 2009, John Deere filed a Motion For Leave To Amend Its Counterclaim To Recover Attorney's Fees Resulting From Claimants' Refusal To Arbitrate in which it sought to recover expenses and fees incurred in ancillary federal court proceedings (RX20 A-H) to compel this arbitration. The motion was subsequently withdrawn without prejudice and was not raised by John Deere thereafter.[2]

In this arbitration extensive discovery was requested by the parties and allowed by the Panel. Various motions were raised and addressed by the Panel. The Panel entered a Scheduling Order on October 3, 2008, which was modified several times thereafter. The parties filed their

---

[1] Hearing exhibits are cited as follows: Joint Exhibits as "JX," Claimants' Exhibits as "CX," and Respondents' Exhibits as "RX." In addition, the parties entered into a "Joint Stipulation of Undisputed Facts" and references to the facts so stipulated are cited as "JStip."

[2] See "Order Re: (I) Claimants' Motion To Compel Production of Documents And (II) Respondents' Motion For Leave To Amend Its Counterclaim To Recover Attorneys Fees Resulting From Claimants Refusal To Arbitrate" entered August 21, 2009 by the Chair serving as Discovery Arbitrator in this proceeding.

respective pre-hearing briefs and the hearing on the merits of the dispute was then held on November 16 through 19, 2009 (the "Hearing").  Counsel for the parties confirmed at the Hearing that they wished to have a reasoned decision and Award as provided in the arbitration provisions of their respective dealer agreements.

At the Hearing, in accordance with the Panel's Pre-Hearing Order dated August 31, 2009, Claimants offered in evidence the prepared written direct testimony supplemented by live testimony of the following witnesses: Jeff Caudill, Lesa Caudill Berry, James ("Jay") C. Justice, III and Russell T. Jones.  Claimants also introduced the prepared written direct testimony and Deposition of John Hawley, who had been identified by Claimants as one of its Hearing witnesses but was not present at the hearing and available to be cross-examined.  Respondents presented prepared written direct testimony in the form of Affidavits supplemented by live testimony of the following witnesses:  Darren Havens, Joshua Sears and Adam Otts.  The parties also presented Joint Exhibits as well as Exhibits in support of their respective sides.  These were all admitted without objection except for Claimants Exhibits 18 and 19, which were withdrawn.

Extensive cross-examination was conducted of all the live witnesses who were present at the Hearing and available to be cross-examined except for Steve Ball, the General Counsel of Claimant  James C. Justice Company, Inc. ("JCJC"). Mr. Ball had been listed as a witness for Claimants and was present throughout the Hearing. In lieu of calling him to testify, however, Claimants offered the deposition of Mr. Ball.  Respondents' objection to receiving his deposition in evidence was sustained by the Panel, since he had been identified by Claimants as a hearing witness, was present throughout the Hearing but was not called to testify and allowed to be cross-examined.

#12173515 v2

Claimants filed their post-hearing brief on December 18, 2009.  Respondents filed their responsive brief on January 22, 2009, and Claimants filed their reply on February 5, 2010. The hearings in this proceeding were closed on February 15, 2010.

The Parties having elected not to have a court reporter or any recordation of the proceedings at the Hearing,  the facts as set forth below are derived from the notes and memories of the Panel as well as from the Exhibits, prepared written witness testimony, and Affidavits received into evidence.  Where appropriate and possible, citations are given to Exhibits admitted during the Hearing.

To the extent there were factual conflicts in the testimony, the Panel had ample opportunity to observe the demeanor of the testifying witnesses and to make their own determinations of credibility.

## II.      The Facts

### The RP Johnson Agreement and the Caudills' Decision to Sell RP Johnson:

Since 1987, the Caudill family had operated a family-owned John Deere dealership store in Wytheville, Virginia, pursuant to a license issued by John Deere to Claimant, the RP Johnson Company.  That license, including the area of responsibility ("AOR") of the business, the right to use the John Deere trademark and the other terms and conditions governing the relationship between RP Johnson and John Deere, were defined in the RP Johnson Dealer Agreement. (CX2). Several of the provisions in that Agreement bear directly on consideration of Claimants' claims in this proceeding, as follows:

> I.H.3. If Dealer wishes to sell its business or substantially all of the assets of its business (excluding Dealer's appointment and this Agreement, which are not transferable by Dealer), Dealer will notify Company before the beginning of any discussions or negotiations pertaining to the proposed sale.  After giving such notice, Dealer may enter into negotiations to sell its business or assets (excluding Dealer's appointment and this Agreement) to a third party. Company retains at all times the right to decide, in its sole discretion, whether to appoint any person

-4-

or entity as a dealer for Dealer's AOR, for any portion thereof, or for any other area.

IX. Dealer's rights and obligations under this Agreement may not be assigned or transferred. Any attempt by Dealer to assign its rights or obligations under this Agreement shall be null and void.

Since at least 2001, RP Johnson's dealership had not been performing at a level acceptable to John Deere and had been placed in its so-called Low Performing Dealer (LPD)[3] process. The performance issues included below average market shares as well as absorption rates[4] considered to be too low to sustain a John Deere dealership.[5] In January of 2005, James W. Caudill, father of Jeff and Lesa Caudill Berry (hereafter "Jeff Caudill" and "LC Berry" respectively), was diagnosed with cancer and about 6 months later died. James W. Caudill was president of RP Johnson and was a "Key Person" under Section I.H. of the RP Johnson Dealer Agreement, i.e., a person considered "particularly vital to Dealer and to a successful working relationship between Company and Dealer." (CX3, JStip 8)

During the time frame when RP Johnson had performance issues, John Deere developed and was advancing its Dealer of Tomorrow Program (the "Program"). John Deere emphasized in the Program that, in order to remain competitive, its dealers needed to get larger and more efficient, primarily by merging, consolidating or selling. (Testimony of Darren Havens) This Program was recognized by Claimants as a sensible and perhaps inevitable path for John Deere to take. (Testimony of Jay Justice and LC Berry.) Indeed, evidence was adduced that many

---

[3] The Low Performing Dealer designation reflects performance by a dealer that is unsatisfactory and requires improvement or the dealer may be terminated by John Deere. (Havens Declaration)

[4] Absorption rates are the rates determined in advance for all cost centers for allocating fixed costs and variable costs (together or separately) to the output, in an accounting period. These rates are sometimes called the recovery rate.

[5] See RX 6 (Summary of Correspondence and Communications from John Deere to RP Johnson re: Performance Deficiencies.)

#12173515 v2

well-known farm equipment manufacturers, and also dealers, have merged or been acquired in recent years. (Testimony of Darren Havens)

Although John Deere did not require its dealers to merge or acquire, it promoted the Program and gave dealers certain incentives and tools to grow or merge. (See CX 24; RX 5; Havens Declaration.) While recognizing that this Program was a necessary evolution for John Deere's dealers, Jeff Caudill testified that RP Johnson had no interest in acquiring or merging with another John Deere dealer. Thus, the Caudills decided to sell RP Johnson to another dealer.

In this context, Jeff Caudill & LC Berry set out to try to sell the business. They recognized that their business was in a decline and that the Program was inconsistent with RP Johnson's own plans.

### Attempted Sale of RP Johnson to James River Equipment Company:

Shortly after their father died, Jeff Caudill and LC Berry contacted Josh Sears, their John Deere Territory Manager, for advice on how to put RP Johnson on the market for a potential sale. (Testimony of Jeff Caudill and Josh Sears) Sears put them in touch with Christopher Thompson at James River Equipment Company ("James River"), a nearby large and successful John Deere dealer. (Otts Decl. §11.) John Deere's witnesses testified that James River, located in Ashland, Virginia, was a promising candidate to purchase RP Johnson.

Jeff Caudill and LC Berry then met with and negotiated with James River. James River was interested in potentially acquiring the stock of RP Johnson exclusive of its real estate. Jeff Caudill and LC Berry testified that they could live with this kind of deal. (Testimony of LC Berry). RP Johnson and James River exchanged financial and operational information under a confidentiality agreement they entered into as part of the negotiations.

Jeff Caudill and LC Berry testified that as the negotiations proceeded they felt James River was not negotiating in good faith because it would not agree to pay the "fair market value"

of RP Johnson's assets.  Jeff Caudill and LC Berry testified that they based their numbers for

"fair market value" of RP Johnson's assets on numbers provided by their accountant, Roy

"Rusty" Jones, but provided no explanation as to how Mr. Jones reached his numbers.  In his

subsequent testimony, Jones explained that the values he provided the Caudills for the

negotiations were not "fair market value" but rather were based solely on information from RP

Johnson's books, that  had been provided to him by RP Johnson.  Jones further testified that the

assets identified as "market value" had not been determined to be set at market value but only as

a starting point for negotiations.[6]  According to Sears, Thompson told him that the prices sought

by RP Johnson for its assets were unrealistic and would have created too high a debt load to

allow the merger to be sustainable.  Mr. Thompson had done a number of successful mergers of

John Deere dealerships, whereas the Caudills were trying to complete their first one.  James

River and RP Johnson were unable to reach agreement on the values of the RP Johnson assets.[7]

The Panel finds that the Caudills had an unrealistic and unproven view of the value of the

company which impeded the potential sale of RP Johnson to James River.  Claimants assert that

the value of the business should also have included appropriate compensation for "blue sky"

value, i.e., the good will value or going concern value of RP Johnson.  Claimants contend that

John Deere instructed James River not to agree to pay for blue sky and going concern value, or at

least influenced James River's decision not to agree to pay for same.  No James River witnesses

were called  by Claimants to testify regarding these assertions, nor was any other evidence

presented in support of either of these contentions. John Deere's witnesses vehemently denied

---

[6] In his testimony, Jones provided his definition of what he believed to be the fair market value of an asset, which was the price that a willing buyer will pay and that a willing seller will accept for the asset.

[7] Sears testified that "RPJohnson's assets were overvalued and sometimes duplicated and that was why the deal did not work out." (Sears Decl. § 28.)

that they in any way tried to influence what price James River would pay or how any part of the deal should be valued. The Panel find the testimony of John Deere's witnesses to be more credible than that of the Claimants, and that Claimants contentions in this regard are speculative and unproven.

During the course of its negotiations with James River, on January 19, 2006 RP Johnson granted an exclusive option agreement to Claimant JCJC, expiring on February 20, 2006, to purchase all of its issued and outstanding stock."). (CX5). The next day, on January 20, 2006, Jeff Caudill notified Chris Johnson of James River by email that RP Johnson had decided to suspend its negotiations with James River for thirty days. (JX 6; CX 6). Specifically, Jeff Caudill wrote on behalf of RP Johnson:

> We are writing this to inform you that as of Thursday January 20, 2006 we have entered into an exclusive option agreement with another entity. As part of that agreement, we have agreed not to market or sell any stock of assets of RP Johnson Sons Inc. for 30 days. Therefore we will have to suspend sales negotiations with James River Equipment at this time. Should this option not be exercised, we would of course like to pursue our options with James River Equipment in the future. Thank you for your interest in RP Johnson Sons Inc. *Id.*

Although, as noted below, this option agreement never evolved into a contract of sale, the Caudills never returned to its "options" with James River. No evidence was proffered by Claimants as to what RP Johnson could have received had the Caudills realistically adjusted their valuation of the company's assets and attempted to negotiate an agreement to sell within a reasonable range of James River's concept of the assets' value. RP Johnson simply terminated negotiations with James River and pursued its negotiations with JCJC.

The Panel finds that both RP Johnson and James River were acting independently and in their own economic interests, as they perceived them to be at the time. Claimants allege that a conspiracy existed between John Deere and James River to force RP Johnson to be acquired by

James River. But Claimants have failed to prove that there was such a conspiracy. The Panel notes that Claimants neither called nor sought to subpoena any witnesses from James River nor filed any statement of witness unavailability.

As further addressed herein relative to Claimants' conspiracy claim, Claimants' proffered evidence of the alleged conspiracy is insufficient as it rests essentially on (1) the unsupported and uncorroborated hearsay testimony of the Caudills as to what Chris Johnson of James River allegedly said to them; (2) testimony concerning the unexpected arrival at RP Johnson's facility during its negotiations with James River of certain new John Deere computer equipment allegedly intended to assist James River if and when it acquired RP Johnson; and (3) James River's hiring of an RP Johnson employee soon after its negotiations with James River were terminated.

Although Claimants in advancing their conspiracy theory place great reliance on the delivery of the computer equipment, John Deere's witnesses testified that the delivery was essentially an administrative glitch created by James River's anticipation of being able to make a deal with RP Johnson. The evidence regarding the parties' negotiations simply does not prove that James River was doing anything but negotiating in good faith, at arm's length and in its own business interest. It does not show, as Claimants' counsel argued at the Hearing, that there was some kind of conspiracy between James River and John Deere to reduce the price for RP Johnson or to force RP Johnson to sell to James River and only to James River. The Panel finds that there was no persuasive proof of any such conspiracy and that no such conspiracy existed.

**Attempted Sale to Claimant JCJC (Blueridge Farm Center, Inc.):**

LCBerry testified that RP Johnson's negotiations with Blueridge Farm Center, Inc. (hereafter "Blueridge"), a John Deere dealer in Buchanan, Virginia that is wholly owned by Claimant JCJC, began with a call from John Hawley, the newly appointed General Manager of Blueridge. Hawley's call led to an option proposal that seemed to RPJohnson to be an attractive offer. As Blueridge also was in Sears' territory, Hawley initially had contacted Sears regarding Blueridge's interest in potentially acquiring RP Johnson. However, as described more fully below (and unbeknownst to RP Johnson), Blueridge was not an ideal buyer candidate as it had a recent troubled history of credit and other performance problems as a John Deere dealer, which JCJC's President, James C. Justice, III ("Jay Justice"), admitted in his testimony.

On January 6, 2006, RP Johnson and JCJC entered into a Confidentiality Agreement to facilitate the exchange of business information. (CX4) Within two weeks, on January 19, 2006, the parties (with JCJC acting for Blueridge) had entered into an option agreement granting JCJC the exclusive right for approximately 30 days to purchase all of the stock of RP Johnson for $600,000. (CX5)

Like the RP Johnson Dealer Agreement described above, the dealer license agreement between John Deere and Blueridge Farm Center, Inc. Buchanan, Virginia, dated June 8, 2004 (RX2) (the "Blueridge Dealer Agreement"), had express limitations and required procedures to be followed in order for Blueridge to potentially acquire or merge with another John Deere dealer:

> I.B.1. … Dealer will not open any new Dealer location, relocate or discontinue a Dealer location, or change the purposes of a Dealer location, without obtaining Company's prior written approval.
>
> I.H. Any change in the ownership, management, or business structure of Dealer could have serious negative consequences for Dealer and Company.

#12173515 v2

Company considers the Key Persons to be particularly vital to Dealer and to a successful working relationship between Company and Dealer.

1. Dealer agrees to give prior written notice to Company and consult with Company regarding changes in Key Persons and to provide a plan of action acceptable to Company regarding the replacement of the Key Person(s). Dealer further agrees to give prior written notice, consult with and explain to Company's satisfaction that any change in ownership, the business structure or Key Person(s) will not materially affect the business relationship or the financial security position between Company and Dealer.

2. Dealer will execute such agreements or other documents as Company may deem necessary to preserve Company's rights under this Agreement or any other agreement between Dealer and Company in light of a change or proposed change in Dealer's ownership, management, or business structure.

3. If Dealer wishes to sell its business or substantially all of the assets of its business (excluding Dealer's appointment and this Agreement, which are not transferable by Dealer) Dealer will notify Company before the beginning of any such discussions or negotiations pertaining to the proposed sale. After giving such notice, Dealer may enter into negotiations to sell its business or assets (excluding Dealer's appointment and this Agreement) to a third party. Company retains at all times the right to decide, in its sole discretion, whether to appoint any person or entity as a dealer for Dealer's AOR, for any portion thereof, or for any other area.

For purposes of this Agreement, a change in business structure shall include, without limitation, a change in the legal form of Dealer (e.g. from partnership to corporation); a change in the legal form of any Key Person or of any entity that holds, directly or indirectly, any ownership interest in Dealer; a merger or consolidation involving Dealer; the creation of a subsidiary, partnership, or other legal entity by Dealer; and any other change that may affect any right or obligation under this Agreement or any other agreement between Dealer and Company.

IX. Dealer's rights and obligations under this Agreement may not be assigned or transferred. Any attempt by Dealer to assign its rights or obligations under this Agreement shall be null and void.

* * *

Exhibit 6

3. Dealer shall request and obtain written approval from Company prior to discussing (directly or indirectly) with any dealer a possible purchase of a dealership that would add to Dealer's AOR or constitute a new area of responsibility for Dealer. Company, in its sole discretion, shall have the right to

reject such a request, to disapprove additions to Dealer's AOR, and to refuse assignment of a new area of responsibility to Dealer.

Jay Justice testified that Hawley told him that John Deere was in favor of the purchase of RP Johnson by JCJC and that Sears had given a "verbal" approval of the deal before the Exclusive Option Agreement was signed. On cross-examination, however, Jay Justice admitted that he did not know the extent of Sears' authority and did not believe that Sears alone had the sole authority to approve the deal but assumed that Sears had secured the necessary approvals. Jay Justice also acknowledged that he knew that "more paper work" was required and that written approval of the deal by John Deere was required. He also testified that he was assured by Hawley that written approval would be forthcoming and that he (i.e., Jay Justice) relied on that representation. Jay Justice's double hearsay testimony that "verbal" approval had been given by John Deere was not only uncorroborated, but was also directly contradicted by himself and by John Deere witnesses.

The Panel notes that Hawley, who by the time of the Hearing was no longer employed by Blueridge, was listed but not called as a witness by Claimants; and that no request for a subpoena or representation of unavailability was made by Claimants. Hawley had been deposed, however, by Respondents' counsel prior to the Hearing. In the course of his deposition, Hawley was also examined by Claimants' trial counsel, but was not asked by Claimants' counsel and did not testify that he had been given an oral approval by Sears for the acquisition of RP Johnson by JCJC. Nor was such a representation made by Hawley in his prepared written statement. To the contrary, Hawley's prepared written statement conceded that he knew it would be an "uphill battle" to gain John Deere's approval of JCJC's purchase of RP Johnson.

LCBerry testified that she knew that John Deere needed to approve the acquisition of RP Johnson by JCJC/Blueridge in order for JCJC/Blueridge to continue to operate RP Johnson as a

-12-

John Deere dealership. She testified that she called John Deere executive Adam Otts to get John Deere's verbal approval to move forward with the process although she knew that more would have to happen in the approval process. She testified that Otts indicated that he did not see any major stumbling blocks with a proposed sale to JCJC, which she said she understood to mean that there was no reason not to move forward in the negotiations with JCJC. The Panel concludes from her testimony that she understood that the acquisition of RP Johnson by JCJC had not in fact been verbally approved by John Deere, that some sort of formal approval was required to be obtained from John Deere before the transaction could be consummated.

Subsequent John Deere witnesses, including Otts and Sears, expressly denied that any verbal approval of the transfer of the John Deere dealership and trademark rights to JCJC was ever given. The Panel finds Sears and Otts to be credible witnesses and accepts their testimony. The Panel rejects as unpersuasive Jay Justice's testimony on this point, while noting that even if his testimony had been credible, the Blueridge Dealer Agreement (RX2, Exhibit 6, par 3) expressly required that Blueridge obtain written approval from John Deere for any "possible purchase of a dealership that would add to [Blueridge's] AOR or constitute a new area of responsibility for [Blueridge]." *Id.* Thus, even if John Deere had given the alleged "verbal" to JCJC to proceed with the preparation and submission of a business plan seeking approval by John Deere that would have had no legal effect on the ultimate question of approval by John Deere. This would not satisfy the terms and conditions of the dealership agreements of either JCJC or RP Johnson, both of which expressly require written approval from John Deere before such an acquisition and transfer of rights could be consummated.

In furtherance of the potential sale of RP Johnson to JCJC, Hawley, with the assistance of Sears, proceeded in March 2006 to prepare a business plan "dealer proposal" for submission to

-13-

John Deere for its consideration. (RX12) They worked on the submission together, using a standard computerized format on the John Deere computer system with Hawley providing substantive input and Sears recording the information and providing other assistance. Sears testified that he had to provide considerable assistance to Hawley because Hawley was new to his job and to the industry (he had just started at Blueridge on November 1, 2005, having previously been a used car salesman). Sears also testified that he wanted to help Blueridge put together a good proposal. Normally the dealer would prepare the proposal, using a template provided by John Deere, but Hawley had never done this kind of a deal before, so he sought Sears' assistance.

In the process of putting the proposal together, Sears testified that he told Hawley of John Deere's concerns with Blueridge's poor credit history and that this might affect John Deere's willingness to approve an acquisition of RP Johnson. (Sears Statement at ¶10). He testified that he knew that the dealer proposal did not address the credit history issues and that he told Hawley to talk to JCJC about the credit problems and to work on those issues and address them with John Deere. Jay Justice admitted on cross-examination that Hawley told him it would "be an uphill battle" to get John Deere to approve the deal.

JCJC's dealer proposal to acquire RP Johnson was submitted to John Deere on or about March 10, 2006. (RX12) Although Sears helped prepare the proposal, in his Field Managers' Recommendation, he recommended against the merger. (RX13) While he found there to be some potential advantages, he pointed to the creditworthiness issues and the need for Blueridge to make the necessary financial commitment to ensure creditworthiness. He also noted that the dealers were non-contiguous, so would not likely gain the economies of scale that were more obvious for adjacent dealerships. In this regard, Claimants also contend that John Deere had

-14-

indicated that it would approve the JCJC/RP Johnson deal if the John Deere dealership in Christiansburg, which was located in between the RP Johnson and Blueridge dealerships, were also being acquired by JCJC.  However, the evidence of  does not support Claimants' allegation that John Deere required[8] JCJC to purchase the Christianburg dealership as a condition to purchasing the RP Johnson dealership.  The John Deere witnesses denied such a condition was imposed, Claimants produced no witnesses from the Christianburg dealer, and the evidence that was adduced was speculative at best.  Claimants failed to carry their burden to establish such a condition.

The JCJC/RP Johnson  proposal was rejected by John Deere on March 21, 2006.  (RX 14) The rejection was based on the issues Sears had warned Hawley about; the rejection was not based on information in the proposal or because JCJC had not acquired the Christiansburg dealership.  Despite Claimants' contention, the evidence does not establish that John Deere would have approved the deal with RP Johnson if JCJC had acquired Christiansburg.  Rather, the record confirms that the deal was rejected because of Blueridge's recent prior conduct involving credit and other financial issues and other violations of the Blueridge Dealer Agreement.   After listing 9 improvements that Blueridge had to achieve in order to obtain John Deere's approval to transfer its trademark, John Deere's letter of rejection stated:

> Although we have seen improved performance, this needs to be sustained over a period of time.  Until such time that we have a clear 3-year history on the above items, we will not be approving additional contracts or locations for Blue Ridge Farm Center, Inc. (RX 14; JStip 14)

---

[8] Sears does not state in his Recommendation that John Deere should require Blueridge to acquire the Christianburg dealership as a condition of approval.  He observes only that the "business case would be much more appealing if Christianburg,VA was involved to include 3 stores along the I-81 corridor." (RX12, p.3)

John Deere's witnesses testified to the various ways Blueridge had violated the terms of its John Deere dealership agreement. (RX2; Declaration of Darren Havens).   A number of these were cited in the March 21, 2006 letter.   Moreover, Jay Justice admitted at the Hearing that Deere's Credit Department's concerns about JCJC had been "legitimate."   Evidence of numerous instances of misuses of Blueridge's dealership are included in the record. (RX 1A, 1B, Q, E, F, H, I, M, IAA, 19; 6E)

Darren Havens, John Deere's Atlanta Division Sales Manager, testified that the proposed acquisition of RP Johnson by Blueridge was not considered on the merits of the dealer proposal submitted by JCJC (CX8; RX8) because the proposal did not get past the credit issues.

Although Hawley had been told by Sears that JCJC should talk to John Deere officials to work on JCJC's credit and related dealership problems, JCJC never did so.   Rather, less than 30 days later, on April 19, 2006, JCJC filed suit in federal court against John Deere.[9]   JCJC never communicated with John Deere about how it might meet the requirements set forth in the March 21, 2006 rejection letter.   Nor did JCJC ever indicate it was going to solve the issues set forth in that letter.   In addition, Jeff Caudill testified in his written statement (at page 5) that he did not receive notice from JCJC until October 17, 2006 that no deal between JCJC and RP Johnson would be possible.   Thus, almost 6 months passed before JCJC revealed that its proposal to acquire RP Johnson had been rejected by John Deere.

---

[9] On June 1, 2006, John Deere moved to compel arbitration and to stay the federal court action.  In November of 2007, a year and a half later, RP Johnson sought to intervene in that action.  It was not until March of 2008 that the federal court ruled, at which time it granted John Deere's motion to stay the proceedings, severed the prohibition of the recovery of treble damages, directed the parties to conduct arbitration of the matter, and retired the case from the active docket of the court. (JStip 16 -20)

-16-

**RP Johnson's Attempted Sale to Blue Ridge Agriculture and Turf Co. Inc.:**

In yet another effort to try to help the failing RP Johnson dealership, John Deere put RP Johnson in touch with another John Deere dealer – Blue Ridge Agriculture and Turf Co., Inc. (BRAT).[10] BRAT indicated it was interested in acquiring RP Johnson and, after discussions with RPJohnson, submitted a draft plan to John Deere for an asset purchase agreement. (CX 17; CX 22, CX 23) John Deere proposed certain modifications to the draft plan (RX 23) because it revealed some weaknesses in BRAT's operation, as well as lack of a plan to deal with those weaknesses. Havens testified he would have approved the BRAT acquisition of RP Johnson had BRAT made the changes John Deere considered to be necessary to the business plan. Claimants contend that Deere's motives with respect to the proposed acquisition by BRAT were based on its scheme to force RP Johnson to sell to James River and no one else. The evidence does not support this contention. To the contrary, the evidence was that BRAT decided not to pursue the asset purchase of RP Johnson. BRAT decided to concentrate on improving its performance within its existing AOR rather than expanding through the acquisition of RPJohnson. (Declaration of Darren Havens) Claimants did not call any witnesses from BRAT or offer any evidence to corroborate its contentions as to why BRAT did not pursue its negotiations with RP Johnson. The Panel finds that Claimants have not adduced credible evidence that BRAT's decision was anything other than an independent business decision of BRAT.

RPJohnson complains that John Deere led it to believe that the BRAT deal would be approved and took too long to consider it, allegedly causing injury to RP Johnson by causing it to continue in business rather than shutting down. However, the record confirms that RPJohnson seemed intent on trying to sell the business rather than shut it down, that John Deere did not

---

[10] BRAT, located in Mt. Airy, North Carolina, is not related, connected or affiliated with Blueridge.

delude RP Johnson, that John Deere acted within a reasonable time frame, and that the decision

to keep operating was RP Johnson's own decision.  There is no credible evidence that John

Deere acted improperly with regard to any aspect of this proposed transaction.[11]

Subsequently, Otts had several conversations with Jeff Caudill as Otts tried to find other

candidates to merge with RP Johnson.  Otts could not find anyone and there is no evidence that

JCJC made any efforts to correct the problems reported by Sears to Hawley at the time the

business plan was prepared and later outlined in the March 21, 2006 rejection letter.  JCJC made

no effort  to meet with or to convince John Deere to resolve the credit and other problems so as

to approve a potential deal with RP Johnson.  Moreover, until October 17, 2006, it appears that

JCJC led RP Johnson to believe that it was seeking out ways to secure approval from John Deere

for a deal but in fact it was not.  Otts indicated that if JCJC had attempted to resolve Blueridge's

prior difficulties, a deal might have been made.  The Panel finds this testimony credible.

On February 21, 2007, RPJohnson ceased operations.  Shortly thereafter, RP Johnson

filed for bankruptcy. (RX 25.).  First Century Bank of Wytheville, Virginia, held various liens on

RP Johnson's real property.  The Bank consented to the voluntary dismissal of RPJohson's

Chapter 11 proceeding on the condition that RP Johnson pursue its claims against John Deere.

(JStip 23-27)  RP Johnson has done so in this arbitration.

Finally, although Claimants allege that John Deere's conduct unreasonably restrained

trade and commerce in violation of the antitrust laws, as more fully addressed herein, they did

not present any evidence to establish the essential elements of such a claim.  Even assuming for

---

[11] Although Jeff Caudill's written statement attributes various actions and motives to John Deere with regard to approval of a deal with BRAT, those representations are explicitly based on statements allegedly made to Jeff Caudill from personnel at BRAT.  Claimants failed to either call or subpoena any witnesses from BRAT to corroborate that hearsay, or to submit a statement of witness unavailability.  The Panel rejects Jeff Caudill's hearsay representations in his prepared statement as not sufficiently reliable to warrant reliance.

-18-

the sake of argument that John Deere's actions and motivations were as Claimants contend, the record lacks evidence, for example, of any relevant market in which trade or commerce was unreasonably restrained or of any impact on interstate commerce.  Claimants did not meet their burden of proof on these critical elements of an antitrust claim.

## The Counterclaims

As indicated above, in its Answering Statement and Counterclaim, John Deere asserted a counterclaim: "Pursuant to the R.P. Johnson Dealer Agreement, R. P. Johnson owes John Deere in excess of $42,523.41 for which payment is past due."  However, it did not mention the counterclaim in either its pre-hearing or post-hearing briefs, nor did counsel present argument regarding the counterclaim at the Hearing.  Further, although LC Berry testified that some money had been owed to John Deere by RP Johnson in connection with the closure of the business, she did not know the amount and noted that John Deere had not pursued collection of the funds in the bankruptcy proceeding. No additional evidence regarding the counterclaim was presented at the Hearing.

## III.    Ruling On The Parties' Claims

### Claimants' Claims:

#### (1.) Breach of Contract (Good Faith and Fair Dealing):

Claimants' first claim is for breach of contract and specifically breach of the implied covenant of good faith and fair dealing during contract performance.  Claimants allege that John Deere violated the covenant as to both RP Johnson and JCJC.

As for RP Johnson, Claimants concede that John Deere had "sole discretion" under Section I.H. 3. of the RP Johnson Dealer Agreement whether or not to approve the proposed deals with JCJC and BRAT to transfer the John Deere trademark license.  As for JCJC, Claimants similarly concede that John Deere had "sole discretion" under Sec. 3 of Exhibit 6 of

-19-

the Blueridge Dealer Agreement whether or not to approve the proposed deal with RP Johnson to

transfer its John Deere trademark license.  Claimants maintain, however, that John Deere was

still required under Virginia law to exercise that discretion in good faith and fairly.  The Panel

concludes that, even if it were to accept Claimants' view of the relevant law, Claimants have

nonetheless failed to adduce evidence to meet the legal requirements they present.

In their Post-Hearing Brief, Claimants cite to <u>Pennsylvania Life Ins. Co. v. Bumbrey</u>, 665

F. Supp. 1190, 1195 (E.D.Va. 1987) for the proposition that a party with a contractual right to

exercise discretion must do so in good faith.  Accepting arguendo that ruling as setting the

applicable standard, the Panel finds Claimants failed to establish that John Deere did not exercise

its discretion in good faith when reviewing the proposals for the sale of RP Johnson.

Claimants also rely on two cases in their Reply brief: <u>Hubbard Chevrolet Co. v. General</u>

<u>Motors Corp.</u>, 873 F.2d 873, 877 (5[Cir.] 1989) and <u>Virginia Vermiculite, Ltd. v. W.R. Grace</u>

<u>Company-Connecticut</u>, 156 F. 3d 535, 542 (4th Cir. 1998).  In <u>Virginia Vermiculite</u>, vendors who

had sold land to defendant, a vermiculite mining company, subject to royalty payments

established that the defendant had improper motives in exercising its discretion with regard to

allowing the mining of vermiculite on the land and thus depriving them of anticipated royalty

payments.  Claimants have utterly failed to demonstrate that John Deere had any such improper

motives in rejecting the proposed sales of RP Johnson.

In <u>Hubbard</u>, as in the current dispute, an economically significant trademark license was

involved, in an automobile dealership agreement.  The auto manufacturer had refused for its own

business reasons to allow the dealer to relocate to a different and allegedly more promising

location.  In dismissing the dealers' claim that the manufacturer had violated an implied

covenant of good faith and fair dealing in the relocation dispute as a matter of law, the Court

-20-

observed that [Michigan law] does not imply the good faith covenant where the parties have " 'unmistakably expressed' their respective rights." *Id.* at 877. The Court noted that the dealership agreement expressly provided that "No change in Dealership Location ... will be made without the written approval of (defendant-appellant) General Motors." *Id.* The Court then held that the district court "had erred when it instructed the jury on the implied covenant of good faith and fair dealing; the covenant has no role to play in the relocation dispute between GM and Hubbard.... [the] contract language leaves no room for a court or jury to supply limits....The contract does not limit the reasons upon which GM can base its relocation decisions. [citation omitted] Hubbard and GM have deferred no decisions regarding relocation or the relevant factors. They gave GM the authority to approve or disapprove relocation for its own reasons, and thus set out the limits of what the contract requires of these parties." *Id.* at 878.

While the Hubbard case was decided by the Fifth Circuit Court of Appeals applying Michigan law, the Supreme Court of Virginia cited it with approval and held that Virginia law is the same in Ward's Equipment, Inc. v. New Holland North America, Inc, 254 Va. 379, 493 S.E. 2d 516 (1997). The Ward's case involved a dispute between a farm equipment manufacturer and a terminated dealer in which the dealer contended that the trial court had erred "in failing to imply the covenant of good faith and fair dealing into the parties' agreement." The Supreme Court of Virginia, applying Virginia law, rejected this argument out of hand, stating:

> In Michigan, as in Virginia, when parties to a contract create valid and binding rights, an implied covenant of good faith and fair dealing is inapplicable to those rights. This is so under either the common law or the Uniform Commercial Code (even assuming a dealership agreement is a contract for the sale of goods). Generally, such a covenant cannot be the vehicle for rewriting an unambiguous contract in order to create duties that do not otherwise exist, citing Hubbard. *Id.* at 385

In a dispute involving a trademark license (here, John Deere's trademark) as distinguished from a purely business relationship as in the Vermiculite case, we believe that John Deere's contractual a right in its discretion to protect its trademark by refusing to allow a transfer of the license without its approval, is not limited by an implied covenant of good faith and fair dealing. As we read the Ward's Equipment decision of the Supreme Court of Virginia, our understanding is clearly consistent with the law of Virginia, and quite distinguishable from by the Vermiculite case and its kindred.

But even if we were to accept Claimants' contention, that an implied covenant of good faith and fair dealing was applicable to the current dispute, we find that Claimants have failed to bring forth factual evidence of any lack of good faith or fair dealing by John Deere. Claimants had the burden of proof to show bad faith but the evidence fails to establish that John Deere acted in bad faith. Otherwise stated, the Panel concludes that the evidence established that John Deere acted in good faith and dealt fairly in considering JCJC's business plan to acquire RP Johnson as well as BRAT's business plan to acquire RP Johnson. The evidence further established that John Deere did not act in combination or conspiracy with James River in dealing with these proposed mergers or otherwise. In sum, in every aspect of the claims that John Deere breached its contract with RP Johnson, and/or JCJC, Claimants have failed to carry their burden of proving any such breach.

### Implied Covenant of Good Faith and Fair Dealing – RP Johnson Dealer Agreement:

Claimants first assert that John Deere violated its duty of good faith and fair dealing to be honest and candid with RP Johnson about the prospects of its dealership being sold to any John Deere dealer besides James River. They claim that RP Johnson would have wound down its operations earlier, and not pursued the potential deals with JCJC and BRAT, if it had known that

John Deere would have only approved a deal with James River.  They further allege that John Deere encouraged or directed RPJohnson to approach other dealers, such as JCJC and BRAT, about a deal and then wouldn't approve the deals for the reason that they were not James River. Once again, even if the Panel were to accept Claimants' view of the law, Claimants have failed to present credible evidence to establish a factual basis for the application of that law.

As support for John Deere only wanting RP Johnson to be sold to James River, Claimants point to the premature delivery of the computer equipment, other dealers allegedly being told by John Deere that it was a "done deal", and John Deere allegedly telling James River not to pay for "blue sky" since RP Johnson would have had no other option than to accept whatever James River proposed.

As a threshold matter, we do not find that John Deere only would have approved a deal with James River.  There is considerable evidence that this was not the case and Claimants have failed to carry their burden of establishing this contention.  That some computer equipment was mistakenly delivered to Johnson does not change this fact.  Also, even if the Panel were to accept the testimony of Claimants' witnesses that other dealers were being told that it was a "done deal", this does not prove that John Deere only would have approved a deal with James River. Moreover, that John Deere assisted RPJohnson in seeking out other potential deals belies Claimants' position and, as indicated, the Panel does not find that John Deere told James River not to pay for "blue sky."

With regard to RP Johnson's claim that it would have shut down the business earlier had it know John Deere was not going to approve its merger with JCJC, as noted above, Jeff Caudill's own testimony establishes that JCJC withheld John Deere's decision for almost six

-23-

months. And, in any event, it was RP Johnson's decision to remain open and RP Johnson must take responsibility for that decision.

Accordingly, the Panel finds that John Deere did not violate its implied covenant of good faith and fair dealing in connection with the potential deal with James River or by encouraging and assisting RP Johnson to pursue the potential deals with JCJC and BRAT. Rather, the record shows that John Deere was trying to help RP Johnson achieve the desired sale of its business by pursuing what were, in fact, rather limited options. The Panel also finds, for the reasons described previously, that John Deere did not act improperly in not approving the JCJC and BRAT deals.

Claimants also assert that John Deere violated its implied covenant of good faith and fair dealing by not disclosing the identities of other potential buyers, such as Maurice Slaughter. Here also the record simply does not support Claimants' position and yet again Claimants fail to carry their burden of proof.

In sum, the Panel finds that Claimants have failed to prove that John Deere violated its implied covenant of good faith and fair dealing relative to the RP Johnson Dealer Agreement.

### Implied Covenant of Good Faith and Fair Dealing – JCJC Dealer Agreement:

The thrust of Claimants' argument is that because JCJC did not acquire the Christiansburg dealership, John Deere refused to approve its proposed deal with RP Johnson and that this refusal violated the implied covenant of good faith and fair dealing in the JCJC Dealer Agreement. Yet again, Claimants' legal theory lacks an evidentiary base. Claimants rely heavily on the credit and other performance related reasons John Deere provided for rejecting the deal. They claim, for example, that the reasons had no relationship to the business realities of JCJC in 2006, that John Deere in fact recognized that JCJC had the necessary capital and equity to expand and conform to the Dealer of Tomorrow goals and that JCJC had had a "clear credit

-24-

history" since May 2004. Claimants collaterally allege that the credit issues were not included in the merger proposal which Sears helped prepare, that Sears knew all along that the proposal would be rejected, and that the proposal should not have been submitted by Sears before getting credit-related information from JCJC. According to Claimants, although John Deere created the pretense that JCJC's proposal would be evaluated fairly, it was not evaluated fairly since there was no legitimate reason to reject it.

The problem with all of this argument is that, as the Panel has previously found, it relies on speculation rather than fact. The record does not support Claimants' position. The Panel does not find that JCJC's proposal was rejected because JCJC did not acquire Christiansburg. The Panel also does not find that the reasons provided by John Deere for rejecting the deal were a pretext, illegitimate or otherwise not supported by the evidence. The Panel finds, therefore, that Claimants have failed to prove that John Deere violated its implied covenant of good faith and fair dealing relative to the JCJC Dealer Agreement.

### (2.) Tortious Interference and Conspiracy To Harm Business:

Here, Claimants allege that they had a "contract expectancy" pursuant to their Exclusive Option Agreement, that John Deere was aware of the expectancy, that John Deere intentionally interfered with the expectancy by requiring JCJC to acquire the Christiansburg dealership as a condition for approval of the RP Johnson/JCJC deal, and that John Deere's refusal to approve the deal was based on illegitimate business reasons. Citing Virginia's business conspiracy statute, §18.2-499 of the Virginia Code, Claimants also assert that the improper method used by John Deere to interfere with the parties' expectancy was John Deere's conspiracy with James River and/or violations of federal antitrust laws, i.e., the Sherman Act.

#12173515 v2

Claimants lay out the elements of such a claim for tortious interference, relying on

Maximus, Inc. v. Lockheed Information Management Systems Company, Inc., 254 Va. 408, 414

(1997). Accepting that articulation as the relevant standard for this claim, the Panel finds once

again that Claimants failed to carry their burden of proof that John Deere intentionally interfered

with Claimants' contract expectancy. Similarly, Claimants rely on Allen Realty Corp. v.

Holbert, 227 Va. 441, 449, 318 S.E.2d 592, 596 (1984), for the proposition that, to recover in an

action for conspiracy to harm a business, Claimant must prove a combination of persons for the

purpose of willfully and maliciously injuring plaintiff in his business. Yet again, Claimants fail

to meet the legal standard they would have the Panel apply.

The Panel finds that Claimants' second claim fails for lack of factual support,

even if their view of the law is accepted. Claimants rely on speculation and unsupported

assertions in lieu of facts. From a factual standpoint, as previously found, John Deere did not

require JCJC to acquire Christiansburg as a condition for approval of the RP Johnson/JCJC deal

and the reasons provided by John Deere for rejecting that deal were not illegitimate. As the

Panel has also found, John Deere did not conspire with James River to injure RP Johnson in its

business. In sum, the Panel finds nothing improper about John Deere's conduct relative to

Claimants.

### (3.) Antitrust Claim

Claimants base this claim solely on an alleged violation of Section 1 of the Sherman Act,

15 U.S.C. §1. It is long-settled that to establish a violation of Section 1, a party must establish a

combination or conspiracy resulting in an unreasonable restraint of trade. Application of the so-

called "rule of reason" determines whether or not a particular practice is unreasonable and,

therefore, prohibited.

#12173515 v2

Since Claimants have not proven any of the essential elements of this claim, this claim also fails. The only "combination or conspiracy" Claimants allude to is the one between John Deere and James River. As previously found, however, no such conspiracy was proven. Although Claimants collaterally attack John Deere's Dealer of Tomorrow Program, and certain related business practices adopted by John Deere which allegedly favored larger John Deere dealers over smaller ones such as RP Johnson, Claimants fail to demonstrate how those practices support a violation of Section 1. For example, they do not show how, for purposes of proving a violation under Section 1, they constituted an unreasonable restraint of trade. They similarly fail to demonstrate how John Deere's ability to approve or disapprove a deal such as the potential RP Johnson/JCJC deal supports a violation of Section 1. Claimants also have not even addressed such questions as the relevant market or how anything John Deere may have done affected competition between John Deere and its competitors, or whether any of John Deere's actions were an "unreasonable restraint of trade."

Accordingly, the Panel rejects Claimants' conclusory assertion that the net effect of John Deere's actions, policies and alleged conspiracy with James River lessened potential purchasers of RP Johnson, and thus suppressed competition, given not only the failure of proof to establish these facts but also any facts necessary to prove the legal prerequisites of a Section 1 violation.

### Claimants' Damage Claims

Since the Panel finds that Claimants have failed to establish John Deere's liability under any of the theories of the Demand, we need not reach the numerous issues raised by Claimants' damages claims.[12]

---

[12] For example, Claimants provide no explanation for the large disparity between the losses sustained in RPJohnson's business (as evidenced by the Rusty Jones Declaration and testimony) and the much larger amount by which the RP Johnson line of credit was consumed. Although RPJohnson claims damages for the larger amount, the

(continued...)

-27-

All of Claimants' claims in this proceeding are, therefore, hereby DENIED.

### Respondents' Counterclaim:

As the only counterclaim concerns John Deere's claim that RP Johnson owes John Deere the amount of $42,523.41 under the RP Johnson Dealer Agreement, and Respondents have not proven that claim, it is hereby DENIED.

\* \* \* \* \*

The administrative filing and case service fees of the AAA, totaling $11,250.00, shall be borne equally pursuant to Section 4 of Exhibit 4 of the dealer agreements.

The fees and expenses of the arbitrators, totaling $169,994.26, shall be borne equally pursuant to Section 4 of Exhibit 4 of the dealer agreements.

Therefore, Deere & Company and John Deere Company shall reimburse RP Johnson & Sons, Inc. and James C. Justice the sum of $5,625.00, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by RP Johnson & Sons, Inc. and James C. Justice, upon demonstration by RP Johnson & Sons, Inc. that these incurred costs have been paid.

The parties shall bear their own costs and attorneys' fees pursuant to Section 4 of Exhibit 4 of the dealer agreements.

TO THE EXTENT ANY CLAIM ASSERTED BY ANY PARTY IN THIS ARBITRATION PROCEEDING, OR ANY DEFENSE ASSERTED BY ANY PARTY, IS NOT EXPRESSLY ADDRESSED HEREIN, IT IS DENIED. THIS AWARD IS A FINAL DECISION AND AWARD AS TO ALL MATTERS SUBMITTED TO THIS ARBITRATION AND IS IN FULL SETTLEMENT OF ALL CLAIMS.

---

(continued...)

record fails to connect that claim with any action by John Deere.  Further, Rusty Jones testified that he did not even know how the borrowings were used.   Similarly, the record shows a significant disparity between the valuations set forth in the bankruptcy filings of RPJohnson and its claim of "fair market value" for its assets.

#12173515 v2

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.


March 17, 2010
_____
Date

_Daniel H. Margolis_____
Daniel H. Margolis, Chair


_____
Date

_____
Howard G. Slavit


_____
Date

_____
Donald H. Green

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration.  All claims not expressly granted herein are hereby, denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

_____
Date

_____
Daniel H. Margolis

March 17, 2010
_____
Date

_____
Howard G. Slavit

_____
Date

_____
Donald H. Green

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration.  All claims not expressly granted herein are hereby, denied.

This Award may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

_____              _____
          Date                                                Daniel H. Margolis


_____              _____
          Date                                                Howard G. Slavit


17 March 2010                        _____
          Date                                                Donald H. Green